Read, J.,
dissenting. I can not concur in the opinion of the court just pronounced.
So lar as it depends upon a construction of the statutes respecting the conveyance of estates, or relinquishment of dower by married women, it violates no fundamental principle. This is proper matter for judicial action, and admits no unconstitutional interference with private rights, or an improper assumption of judicial power by a co-ordinate department of state. It is the right of the •legislature to enact laws within the sphere of its constitutional power; but the exclusive right and duty of the courts to determine their meaning and application. Under our system the powers of enacting and construing laws are kept separate and apart; the constitution confers the power of enactment upon the legislature, *515 and construction upon the courts. Hence, when a majority of the court decide that a true construction of the acts of 1805 and 1818, does not require that the certificate of acknowledgment should disclose the fact that the contents of the deed were read, or otherwise made known to the wife by the officer, to render her deed valid for the conveyance of her estate or the relinquishment of her dower, they are within the just limits of judicial action. This is mere matter of construction, and although I may not agree with the opinion of the majority, I feel that no great principle has been sacrificed. I do not believe that the court has placed the right construction upon these acts, but hold, as it has been repeatedly and uniformly held heretofore, by this court, that all the matters and things required by the statute, to give validity to the deed of a married woman,' should appear upon the face of the deed, and in the certificate of acknowledgment. So that upon the mere production of the deed, upon which the statute requires the certificate of acknowledgment to be written, it may appear that the married *woman has conveyed her estate, or relinquished her dower in conformity with law. Under our statutes, all deeds, to be valid at law, must be acknowledged as required; that is a part of their execution. A married woman being placed by law under disability, can only convey her estate or relinquish her right of dower in her husband’s lands, in the mode prescribed by the statute. The deed of a married woman, under our statute, for the transfer or iucumbrance of her estate, or the relinquishment of her right of dower, to be valid for any purpose, must be executed jointly with her husband, and must be acknowledged by the husband and wife at the same time ; and further, the officer taking the acknowledgment must examine the wife separate and apart from her husband, and read or otherwise make known to her the contents of the deed, and being so separate and apart from her husband, with full knowledge of the contents of such deed, she must acknowledge that she freely and voluntarily, without any fear or coercion of her husband, executes it. It is made the positive duty of the officer, by statute, to read or make known the contents of the deed to the wife. If any one of these requirements of the statute does not exist, the deed is not binding upon the wife, and that all the requisitions of the statute have been complied with, must appear, and can only appear in the certificate of acknowledgment, unless it be admitted that their existence may be established by parol. *516 If it did answer to omit the fact of compliance with one requisition in the certificate of acknowledgment, why not omit all? It is answered that the officer is only required to certify tho acknowledgment, and that tho term “acknowledgment” embraces the acts of the wife only, and not those of the officer. That it is made tho duty of the officer to read or otherwise make known tho contents to the wife; and this being his act, and his duty, need not be certified, but will be presumed. This definition of the word “acknowledgment,” as used'in the statute, is too narrow to constitute a good certificate of acknowledgment. It must show more than the acts of tho wife. It is not denied *that the certificate of acknowledgment must show that the officer examined the wife separate and apart from her husband, and that she acknowledged to him that she executed it freely and voluntarily without fear or coercion. It is admitted that every certificate must contain, at least, this much. Yet such a certificate embraces moro than the acts of the wife; it discloses acts of tho officer, to wit: that he examined her separate and apart, and heard her acknowledgment. To limit the requirements of the certificate of acknowledgment to embrace merely tho acts of tho wife, all that it need contain would bo, that tho wife acknowledged that she freely executed the deed. It is admitted that other things must appear besides the mere admission or avowal of the wife, of volition and freedom from restraint or fear, to render the certificate of acknowledgment good under the statute. It must appear that she was apart from her husband, that he examined her, and she acknowledged to him. Hero are both acts of hers, and acts of his, and the circumstance of separation from her husband. Yet it is conceded, that all those things must appear in the certificate of acknowledgment, and are necessary to render it legal. Hence, then, the principle assumed that the certificate to be good, need only embrace tho acts of the wife, and not those of tho officer, an.d other circumstances required by the statute, is unsound, and must be discarded. Upon what principle, then, will it be contended that a certificate is good, if it omit to disclose that tho officer made known the contents to the wile ? A resort is had to presumption, that it being made the duty of tho officer, it must bo presumed he performed it. If this be tho rule, why not apply this presumption to every other act of the officer, and permit them all to rest in presumption, and not require any to be certified? *517 The reason is, that tho positivo requisitions of the statute stand in the way. If the statute requires, as is admitted, that some of the 'acts of the officer must appear in the certificate, is it not quite unreasonable to believe that it intended that the most important of all should bo left to presumption, to wit, that he *had read or made known tho contents to the wife. Is it to be supposed that it was intended that it should be stated in the certificate of acknowledgment that the officer examined the wife separate and apart, and that it should bo left to presumption that he had made known to her the contents. A married woman could not acknowledge that she voluntarily executed a deed to convoy her estate, or relinquish her dower, unless she knew that the deed embraced such estate or dower. A knowledge of the contents of the deed is necessary to her legal acknowledgment. Hence, the statute makes it the duty of the officer taking it to read, or otherwise make known to her the contents. If the wife admit that she freely and voluntarily executes the deed, and yet have in fact no knowledge of its contents, the acknowledgment is not such as the statute requires. It is in fact no acknowledgment under the statute, and the result in such case is precisely as though no acknowledgment had been made. It is admitted that the certificate of acknowledgment must disclose all that the wife did, and also that the officer examined her separate and apart from her husband, and that he took her confession that she freely executed the deed; and yet that such certificate need not disclose tho fact, that he read or otherwise made known to her the contents of the deed, or that she knew tho contents. It is admitted that a knowledge of the contents is necessary to render the deed valid as against the wife, but that the certificate need not disclose that fact, although it is made tho duty of the officer to inform her as to the contents. Yet a knowledge of the contents is tho chief matter, and is necessary to exist to give effect to all the other requirements of the statute and to the deed itself. To make known the contents of the deed to the wife, is the chief and highest duty of tho officer taking the acknowledgment, because, unless ho does this, he fails in all else. Yet it is contended that the certificate of acknowledgment must contain everything else but this chief, main matter, that the wife knew the contents, and that that is left to presumption. The truth is, the officer can not certify the ^acknowledgment unless he certifies the requisites which *518 constitute and make up the acknowledgment. The chief requisite, indeed the very essence of the acknowledgment, is the knowledge of the contents of the deed by the wife. Hence, hy the very force of the terms of the statute, the certificate must disclose that the wife knew the contents of the deed. The term acknowledgment in the statute does not mean simply that the wife admits that she voluntarily, and without fear or coercion, executes the deed, but that she makes such admission under all the attendant facts and circumstances which the statute requires to make it valid and binding upon the woman, to give effect and validity to her deed. Such admission in the pi'osence of the husband, without a knowledge of the contents of the deed, or to any other person than the officer taking the acknowledgment, or made at a different time from the acknowledgment of the .husband, is not such acknowledgment as binds the wife. The term acknowledgment, then, by its own force, as used in the statute, requires that the admission of the wife, that she freely and voluntarily executes tho deed, shall be made to the officer with full knowledge of the contents, separate and apart from her husband, on being examined by him, he having read or otherwise made known to her the contents of the deed. All these matters go to make up and constitute the acknowledgment required by the statute, and hence, when the statute requires that the officer shall certify the same, it roquires that he shall disclose, in his certificate, every fact, circumstance, and legal requisite, which constitutes such acknowledgment. Hence the certificate of acknowledgment must show that the wife knew the contents, that the officer taking the acknowledgment did read or otherwise make known to her the contents, as the statute requires. If the certificate of acknowledgment be defective, the deed is invalid and not binding in any sense upon the wife.
This is the true interpretation of the statute. The term acknowledgment embraces all that is necessary to make a binding deed under the statute, and every requisition must *be shown to have been complied with in the certificate. The wile being under disability, the law will presume nothing against her, and those who claim to dejurive her of her estate must show that every requisition of the statute, necessary to render her deed valid, has been complied with. That which alone gives effect to every other requisition should at least appear. The knowledge of the con *519 tents is the chief matter, and it can not be supposed that the legislature intended that the certificate might omit that, when every other requisition must be stated. To hold that a certificate is good which does not contain the fact that the contents were made known to the wife, violates, in my judgment, both the letter and spirit of the statute and the presumption of law which always arises in favor of those under disability, that they have not parted with their estates unless it be clearly proven. But after all, this matter rests in construction, and although I believe the majority of the court have erred, very little mischief will result, and probably in a large majority of cases justice will be promoted. Had the majority of the court been content to have rested their decision upon a construction of the statute alone, which, upon the view taken, was all that was necessary to support their opinion, it might have been at least said that they wore yielding to a supposed contemporaneous construction, to avoid the mischiefs of a very general error. I have no regret that they have felt that their duty permitted them to go to this extent. Could I have seen my duty in the same light, I should have been glad to have gone with them. But with my convictions that the statute will not bear the construction which they have given, I could not violate a duty to avoid a mischief. I am exceedingly sorry that they were not content to let their decision rest upon the construction of the acts of 1805 and 1818. This is all that is necessary to support their opinion and prevent the mischief complained of. It is matter of deep and lasting regret, that it had not been permitted to rest here. But when the majority of the court unnecessarily go farther and give validity and effect *to the curativo act of 1835, which this court heretofore has repeatedly declared to be unconstitutional, it then becomes a matter of grave and vital moment, violates the fundamental principles of legislation, breaks down the constitutional distinction of powers among the co-ordinate departments of state, by permitting the legislature to exercise a power alone conferred upon the court, and invades the constitutional rights of private property by attempting to transfer, by legislative enactment, the property of one person to another without trial or a day in court.
In examining a great question like the present, resort should be had to fundamental principles, and the authority of precedent should bo no further regarded than it conforms to reason and the *520 nature of our government. I do not condemn the aid of precedents, but, on the contrary, regard them as a great storehouse of experience, not always to be followed, but from which we may extract the lessons of wisdom and truth; The errors of mankind are as full of instruction as their rightful judgments; the one stands forth to admonish and warn, the other one for imitation and adoption. Had precedent been consulted, our government would never have been formed; and if we adopt the motives and examples of other times and different systems, as rules to determine the nature, extent, and limitation of the powers of our own, as distributed and adjusted among the different departments of state, we shall be certain to err and defeat the ends which our system'was designed to secure. Such notions of government have been of slow development; a rightful comprehension of its true nature and object of but recent date. The most numerous class of precedents are therefore only useful in disclosing what we should avoid, and furnish but few, if any, examples to bo followed. Governments were formerly regarded chiefly for the benefit of those having the power; afterward for the mutual benefit of sovereign and subject, recognizing the duty of obedience and allegiance in the protection extended by the sovereign. This notion prevails now among most modern nations. It *has boon left for us to construct a government upon the true principle, that government is solely for the benefit of the governed. It has been justly remarked by a modern writer that in all governments an absolute power must reside somewhere. With us this absolute power resides with the people; elsewhere, it is claimed to be vested in the government. Hence, the English parliament, in the sense of human power, is said to be omnipotent; with us such omnipotence belongs to, and alone resides with the people. In other governments the right to govern is claimed by those who govern as an inherent personal right. With us those who are called to administer any function or office of government reflect only a delegated authority, to be exercised simply for the benefit of those who conferred the power. Hence, with us no department of state, nor the whole combined, possess absolute power, but only a limited delegated authority.
The people possessing and asserting their inherent natural and absolute power to govern themselves, have adopted such government as they deemed best calculated to promote their happiness *521 and secure their rights. They have fixed the powers of government by exact limitation, and from wise precaution, less the government might claim to itself the absolute powers inherent in a political organization, have by express words reserved to themselves the absolute power, and all powers not expressly granted and conferred; knowing how certain power is to increase by its exercise, unless confined almost by iron limits, wo have most carefully, by written constitutions, limited its grants and guarded its mode of exercise, and reserved the absolute and corrective power to the people, who are those interested in the proper administration of government, and who constituted it for their own benefit. To secure the just exercise of the powers of government and prevent abuse, the several powers of enacting, construing, and executing laws have been separated, and carefully and guardedly distributed to different departments of state, constructed solely and expressly for the purpose, into ^legislative, judicial, and executive. The legislative has the sole right, and power to enact laws, the judiciary to declare their meaning and application, and the executive to enforce their execution. The union of these three powers in one person or body of men is a despotism. To permit the same men or body of men to enact, construe, and execute laws of their own enactment, subjects all over whom such laws have control to the simple will of the law-maker without check or remedy, if wrong be inflicted. To have our rights depend upon the unrestrained will or judgment of another is absolute despotism. An absolute despot might in all instances do right, yot his government is a despotism, for there is no guaranty but his own will that he will do so, and the absence of political security is the absence of freedom. In many governments where tbo absolute power is claimed to reside in the government, the distribution of the legislative, judicial, and executive powers into separate departments and to different persons, is recognized. Yet in such governments, if the principle of distribution and exercise of these several powers be disregarded, there is no remedy; with them it is a simple violation of duty, and the government possessing absolute power, there is no corrective, unless tho government choose to correct it, and the government, if it should see fit, might do away with such distribution of powers altogether. With us it is wholly different; a violation of the principles of distribution and exercise of these several powers *522 on the part of the government would bo a usurpation of power, because the people, who alone possess absolute power, have constructed our government and made this distribution of powers ; and the government possessing but a limited and delegated power, derived from the grant of the people, can not change or modify itself, but must act in obedience to that will which gave it existence, both as to the powers which it may exert, and the mode in which such powers may be extended. An exercise on the part of one department of state (with us) of powers conferred upon a different department is a usurpation of power, and the corrective is to be found in the ^.constitution. The distribution and exercise of these several powers to and by different departments of state, is organic, fundamental, and complete, struck out and converted into separate pillars in our political structure by the will of the people, expressed in the constitution which gave existence to the government itself. This is not the case in other governments; there the distribution of these several powers into different departments and different persons has been a matter of slow growth, has come to be adopted by degrees, and has never been so complete and perfect as in our own, and is not a fundamental and vital principle; hence with them the partial exercise of these several powers by the same man, or body of men in common, and the union of judicial and legislative powers, is frequent; indeed the partial exorcise of judicial power by the legislative department may be said to bo universal. In England, the highest controlling judicial power is vested in the House of Lords; it is, in a word, the court of last resort. Under our colonial organization it was of common, if not universal example, to find the colonial legislature exercising both judicial and legislative powers. Hence we may find precedents both in England and her American colonies, prior to the revolution, of the exercise of judicial powers by the legislative body, and decisions of courts sustaining the exorcise of such powers by the legislature. And over since the revolution some of the state legislatures have claimed and exerted partial judicial powers, and even where these several powers have been completely distributed by the state constitutions, cases may be found of the courts sustaining legislative interference and assumption of judicial power resulting from confused notions of the extent and limit of these powers, a yielding to precedents which arose in cases where the union of both judicial and legislative *523 power existed to some extent or fully in the same body; and from, not carefully noting the distinctions, in the confusion of ideas resulting from precedent and example, have been led to tho erroneous supposition tha't every legislative body might to a certain extent exert judicial powers, *or at least act upon matters which fall solely within the scope of judicial power. To these causes may be referred all tho decisions which support the exercise of judicial powers by the legislative body or tolerate retrospective law which acts upon the past and changes rights previously acquired, which is a matter solely within judicial power. Laying aside those examples not in point, and wrong precedents, we should proceed to examine this question, not upon such authoritj1-, but reason, and in reference to our own constitution, and the nature and extent of the powers thereby conferred. It is our duty not to obscure the principles of our own system by the glare of false precedent, but to advance boldly up to the truths which the development of that system discloses.
The legislative power may enact laws; the judicial declares their meaning. Tho legislative power may declare what shall be law; the judicial what is law, and what has been law. To determine what are the rights and duties of persons in their most minute and broadest forms under existing laws, and what these have been under past laws, is the right and duty of the judiciary. To declare how these rights shall be modified or destroyed, always having a regard to constitutional restrictions, by laws to be enacted, is the right of the legislature, but the meaning and application of these very acts is left for the determination of the courts. In a word, the courts act upon tho past and the present, tho legislative power upon the future. The one declares what has been and is law, the other what shall be law. To declare the legal nature and effect of past acts by positive law, is the most startling tyranny, and violates the fundamental principle of human rights. Every one is bound to obey the law, but to command obedience to a law before it is promulgated, and assert that a law may be enacted at some future period, to make that criminal then which is lawful now; or by the force of a law which may be enacted at some future day, to deprive men of their property rightfully acquired under existing laws, is unmitigated despotism and the assertion *of absolute power over property and life. The exertion of legislative power in such manner, or in the mildest *524 form, and to the smallest extent, and under circumstances whore it would seem in the particular instance to work out right, is the admission of despotic principle, which, in its growth, may strike down all right. The requisition to conform to laws not promulgated, and the infliction of punishment for disobeying laws which were not known, was rightly charged as the worst crimes of a Nero and Caligula, and stand a monument of despotic power to warn, whilst they arouse the universal indignation of mankind. Hence all retroactive laws are odiou.s, and'in violation of every principle of human right. To chock such evils we have declared in our constitution that no ex post facto law should be enacted. This provision, in its true and real signification, means that no law shall be enacted which shall change the rights and liabilities resulting from previous acts, to subject men to punishment, and deprive them of civil rights; ox*, in other words, that no law shall have any but a prospective effect, that it shall act only upon the future, and never upon the past. But the court, whilst they universally condemn, in the strongest terms, retrospective legislation, have unwisely and wrongfully, by being misled from resorting to the exaxixple and conduct of Great Britain to fix the meaning of words in our own constitution, admitted that this great safeguard of our rights only applies to crixxiinal laws. But all the coux’ts condemn retrospective legislation in the strongest language, and assex’t that if glaringly wrong, such laws would not be enforced, but would be held void as violating fundamental principles. It is not too late to vindicate the great constitutional safeguard, which forbids all laws which operate retrospectively upon person or property, either uxxder civil or criminal form. To inflict punishment, or change the rights of property by retroactive laws, is the same in principle. In both instances it deprives a man wrongfully of his rights; and what difference does it make to the person thus injured, whether the government inflict the wrong directly under the forms of criminal *law on her own account, or permit it to be done by another under the form of civil proceedings in a court by authority of unjust law. If it be admitted that laws may have a x*etroactive operation to deprive persons of their rights of property which existed under former laws, when no new act had been done to change such rights, tolerates a power, which, if exerted in its bx’oadest form, would at once sweep away all right. There is but little danger if such a *525 power wore admitted to exist, that it would be exerted in ordinary times to any groat extent; the victims would be few, and under circumstances which would seem to justify it, but it would exist as a weapon, which, in times of high excitement, party madness, or wild fanaticism, might bo used to strike down all who were regarded as obnoxious to those in power. It may bo said such things will never occur, and that such extreme results, though possible, are not sale aids to the formation of right conclusions. Such things have boon—the history of tho world is full of examples; human nature is the same, although it is placed with us under tho most favorable circumstances, and in view of this tho framers of our constitution and the originators of our government wisely and cautiously, in the constitution and very framework of tho government, guarded against these results. I understand this court; I understand the majority who pronounce the decision in this case to declare, in strong language, that retrospective legislation, which changes tho right of property, violates a fundamental principle, and would at once be held to bo void. I understand it to bo the universal voice of intelligent American decisions that such legislation will not bo sustained. I understand it to be the universal sense of all law everywhere, which is formed with just regard to human rights. It is the expressed doctrine of our constitution, and is the fundamental security provided in our system for personal property. I hold, then, as it is admitted and established in its broadest force, that it should bo strictly adhered to in its minutest application, and it becomes our solemn duty to ^establish no precedent which evil times may pervert to evil use.
There is a class of objects within the scope of legislative action which may seem to admit of retrospective laws. But it is not so. The legislature may change remedies, but not rights; may designate the forum or tribunal for tho trial of causes; may change positivo rules of evidence, and convert equitable into legal rights. But in all these cases tho effect of the law is prospective; it only permits to be done in future what could not be done before, and only permits existing rights to be enforced in a different mode. Such legislation does not destroy a right; it does not operate upon the past, but only permits past rights to be carried into effect and prosecuted in future in the mode prescribed.
Let us, in view of these principles, look to'the constitutionality *526 and validity of the curative act of 1835. The great principles which I assert and claim, I understand the majority of the court not to deny; they do not seek to change them, but arrive at the same conclusion- as though they were all sot aside, by exerting the judicial power and reason to do away with the fact that the curative act does deprive the widow of a right to property which she possessed before its enactment. If it be admitted that her right to her property existed, and was perfect before the act, and it is destroyed by the act, and it can not be denied, and that the destruction of this fact is necessary to the support of the curative act, it requires for its support more than has ever been claimed for the omnipotence of the British parliament, that can change laws, hut not facts. If the woman had no rights before the act, there was no necessity for its enactment; if she had, and the act deprives her of her right to her property, then the act deprives her of a previously existing right to property, which violates fundamental principles, which the majority of the court say they admit to be law. The fact that the woman was deprived of her property by the curative act, and that no law can be valid which takes away existing rights, and that the curative act is valid, are throe things *which can not stand together. If the curative act is valid because it deprives the woman of no previous right of property, it must go upon the assumption that it does not take away her property. If it does take away her right to property, it can only do so because a law which deprives a person of previously existing right to property is constitutional. But it is conceded that an act which takes away rights to property is invalid and unconstitutional; this act does take away rights to property, and is therefore unconstitutional and void. It is worse than folly to contend that the curative act does not take away rights to property which existed and were perfect before its enactment, because this is both to claim the advantages of a fact, and to deny existence of the fact, because it can not be tolerated upon principle or the constitution, to claim the benefit of the effect, and deny the existence of the cause which produced it. Unless it be prevented by construction of the acts of 1805 and 1818 (which must be laid out of view in considering the validity of the curative act), every one knows perfectly well that married women, who had not parted with their estates and rights of dower in conformity with law, were still possessed of such estates and *527 rights of dowei’; and that to deprive them of such rights was the sole object, design, and intent of the curative act; it was for this reason, and this alone, that it was enacted. It matters not as to the existence of the factj upon what reason it was sought to be ¿one—the reason upon which it was done does not destroy the fact; and the fact is, that this curative act does not deprive women of rights to property, if supported, which wore perfect before.
But let us examine the grounds upon which it is sought to escape all this, and support the curative act, and avoid the violation of facts and principles which such conclusion necessarily involves.
It is said the curative act of 1835 is valid because it only changes a rule of evidence, and admits a deed to be received in evidence, which before was excluded by reason of more formal defect in the certificate of acknowledgment. *This is not so. Such is not the character of the act. It not only admits the deeds in evidence, but declares their effect. The words are, “ shall bo received in evidence, in this state and elsewhere, as conveying or incumbering the estate or interest of the icife, or as releasing her right of dower.’’ It is thus a law changing the right of property, by giving effect to that which at the time it was done, did not transfer it. It is retroactive; violates all just principles of legislation by giving to past acts the effect to transfer property, when such acts did not transfer it at the time of their occurrence. The curative act was not necessary to admit such deeds in evidence; they were never excluded from mere formal defect, their effect only was denied, and they were not regarded by the court, simply because, as against a married woman, they created no binding right or obligation, and in no sense incumbered or transferred her estate, or relinquished her right of dower.
But it is contended that the curative act is constitutional, because it only declares the effect of deeds which are valid without the act. That the statutes providing the mode in which a married woman might transfer her estate or relinquish her right of dower, did not, if properly construed, require that the certificate of acknowledgment should disclose that the officer taking the same had read or otherwise made known to her the contents of the deed, or that she knew the contents. It is claimed that such had been the construction put upon the statutes of 1805 and 1818, as was, to be gathered from the very general practice of omitting *528 in tho certificate of acknowledgment of deeds of married women, to state that the officers had read or otherwise made known the contents. That it was the general understanding that the certificate need hot disclose that fact, up to the time of the decision in Connell v. Connell, which decided that a deed of a married woman was not valid as against her, to transfer her estate or relinquish her right of dower, unless the certificate of acknowledgment disclosed tho fact that tho officer taking the same had read or otherwise made *known to her the contents. That'this construction of tho statutes by tho .court would deprive many persons of titles whicli they supposed they had acquired; therefore the legislature might pass an act to prevent the effect of such decision, by declaring that deeds which the court had decided did not, for lack of conforming to the statute under which they were executed, divest the wife of her estate or right of dower, should be received in evidence, and bo held by the courts to bo valid as against tho wife to deprive her of her estate or right of dower. What else is this than constituting the legislature into a high court of appeals, not for tho purpose of reversing directly the case decided, but to lay down a rule of decision for tho courts for all other cases involved in tho question, or standing upon like circumstances, or perhaps for tho very case decided upon bill of review or writ of error. Tho legislature say to the court by law, you shall no longer declare that the same legal effect and consequences flow from like facts and circumstances, which you have declared heretofore did result from similar facts and circumstances, but you shall hold in conformity with our will as expressed by our enactment, that precisely the reverse legal effect results. Not that a different legal effect shall be gi-ven to future facts and circumstances of a like sort, but that a different legal effect shall be given to similar past facts and circumstances than tho courts have declared. It is the solo province of the courts to declare the effect and consequences of past acts; the legislature may provide for the future. The court has declared that certain acts of a married woman, by a just construction of statutes in force at tho time, did not deprive her of her estato or right of dower; by law, the legislature declare that those acts shall be hold to deprive her of her estate or right of dower. What else is this than an effort on tho part of the legislature to change the construction which the courts have placed upon tho statutes; not to declare that tho statutes shall be changed in fu *529 ture, but what their operation shall be upon past transactions; to give a different effect to them *than was given to them by the courts; in other words, by law to change the construction of the courts. It is said that the act in question only proposes to change the future decisions of the court. Thisdoe3 not help it at all. It proposes to change the future decisions of the court as to the construction which the court shall give to past statutes upon past acts. The legislature has no power to construe their own acts, or by law to declare what construction the courts shall place upon them. To admit that the legislature may declare what construction the courts shall place upon their statutes, is in effect to admit the power of construction to the legislature. It permits the legislature to do indirectly, what it has no power to do directly. The power to construe laws, to determine the meaning and application of statutes, is solely conferred upon the courts. Viewed in any light in which it may be put, the curative act, if not a direct usurpation of judicial power by the legislature, is in effect the same thing, by an effort to interfere with and control its exercise, and compel it to conform in its judgments to the legislative will: But it is said this is a necessary power in the legislature to correct evil; that if the courts should decide wrong, that the legislature may interfere to prevent the mischief by declaring how the courts shall decide, not in reference to the future, but the past. Not to stop to determine which department would be most likely to be right as to a legal question, or to observe that if the legislature may control one decision of .the court they may all; it may be answered that the legislature have no more power to interfere to correct a Wrong decision of the courts, than the courts have to correct the mischief of an improvident statute. If an act be unconstitutional, it is the duty of the court to declare it to bevojd. The legislature can never interfere with the judicial power. They may change the law as to matters which arise in future, but can never change the effect of a decision of the courts upon the past, or give a construction to their own acts. It would seem to be sufficient upon all this matter to say that the constitution vests the legislature *with no such power. But apart from all these constitutional and fundamental objectio.ns, in answer to those who seem to think that the exorcise of such power by the legislature would be productive of no harm, or attended with no risk, it may be said that the legislature is not the most appropriate body to determine legal questions. *530 It is not the study and business of the lives of members of the legislature to make themselves familiar with the principles of law, nor is the mode of their organization, and their rules and principles of procedure, calculated to develop legal truth. Nor need it be said, if this ppwer were conceded to the legislature, it would never be abused. If any one doubts upon this point, let him look at the case of Price’s heirs. They had prosecuted their claims to certain lands in Ohio, in both the state and the United States court, both in law and equity. The final result was, that the courts determined the land in controversy to belong to the heirs of Price. An application was made to the legislature, setting out that it was a hard case upon the occupants of the land, and the sympathies of that body being moved, they passed an, act taking the lands from the heirs of Price and conferred it upon the occupants. This act was passed not three years ago, and stands unrepealed to this day, á disgrace to the statute-book. I do not charge upon the members of the legislature who passed that act corrupt motives; far from it. I have no doubt they acted from good feelings and sympathy for the occupants, but this would not excuse, would not warrant the exercise of unconstitutional power in an attempt to control the judiciary and interfere with private rights. The only safeguard to our liberties is an adherence to the constitution, and confining each department of state to its true constitutional sphere.
■ It is further said that the curative, act of 1835 was enacted to relieve a doubt as to what the law was, created by the case of Con-hell v. Connell, and quiet the fears of those who reposed safely upon the faith that they had good titles. That case did not create a doubt, but settled it beyond all controversy, *that deeds of married women, which, did not disclose in the certificate of acknowledgment that the officers taking the same had read or otherwise made known the contents to the wife, wore not valid ■to bind her, and divested her of no right. It was to prevent the effect of this decision that the act was passed—not to relieve a doubt. But even if the court should doubt as to the construction ■of a law, that would not authorize the legislature to construe the statute; they might declare clearly what the law should bo in future. In cases of doubt at common law, the English parliament 'has claimed tho right' to declare what is and always has been the common law—it is not even claimed to the parliament that it has the right to construe its own statutes. But were that the case/ *531 the omnipotence of an English parliament is no precedent for the legislature of a limited constitutional government, where every power is expressly conferred and exactly limited. I am ready to admit that an act of this sort might be operative as a ukase of the autocrat of Russia, or a decree of the sultan of Turkey, because as to them there is no power to cheek or restrain it.
But it is contended that the curative act is constitutional, because it merely converts an equitable into a legal right—making that a good title in a court of law, which, without-the act, could only be enforced in a court of equity. If this wei-e the nature of the act it would certainly be constitutional. This would be mere change of remedy, and would be legitimate. But the difficulty which meets this view is, that there is no equity upon which the law can act. ( The defective deed transfers no equity which a court of chancery could enforce. This was decided in the case of Karr v. Williams, 10 Ohio, and is the doctrine of all the books. The deed of a married woman, unless executed in conformity with law, divests her of nothing. But, it is exclaimed, “What! has a married woman no soul ? Is she not a moral agent, answerable to God for her moral wrongs? Shall she be permitted to join in a deed and still hold her estate or right of dower? May she be guilty of fraud, and if a court can give no remedy, *may not the legislature interfere? ” Her rational nature and moral being are not all denied. The simple answer is, the law has placed her under disability. She can only execute a deed to divest herself of her estate, or dower right, in the mode prescribed by the statute, which empowers her to convey. If a party dealing with' a married woman •takes a deed which conveys nothing, he takes nothing under the deed. Whether the law in this respect is wise or unwise, is not for me to discuss. I simply say such is the fact. It is no answer to say that the doctrine of the common law, that the wife’s legal existence is merged in that of the husband, is a mere fiction ; it is not denied but that coverture imposes a real and substantial disability upon the wife. I h'ardly suppose that any lawyer will seriously contend that a married woman is not placed under disability, or that she may deal with her property as a feme sole. If this were the case, any contract of the wife for the sale of her land, or any deed of hers, or conveyance for the transfer of her estate, might be enforced against her in a court of equity or law, as the case might require. This no lawyer can pretend. The *532 books, and our whole system of jurisprudence, are all on one side. I am not saying but that the principles of the civil law are more wise, or that it would not bo better that the wife should be relieved from the disabilities placed upon her by our law. All that I say is, that the law has placed her under disabilities, and that she can not divest herself of her real estate, or relinquish her right of dower, except by deed executed in conformity with the statute, which empowers her to convey and prescribes the mode. A deed by a married woman, not executed in conformity with the statute divests her of no right, and can transfer no right either in law or equity. She is possessed of all her right after the execution of such an instrument, precisely as she would have been had she not executed it. She parts, by such defective deed, with no right, either in law or equity. Nor can such deod be enforced against her, either in law or equity. The majority of the court admit that such defective deed has never been regarded *as transferring any equity as against the wife. No such principle exists in equity, but it stands opposed to our whole jurisprudence. If this novel and strange doctrine be adopted by a majority of the court, it is the insertion of a new beam into our equity structure, out of harmony with the whole system, to support the constitutionality of the curative act—for the decision might stand upon the construction which the majority of the court place upon the acts of 1805 and 1818. The court do not propose to introduce it, in its broadest form; for there would be just as much reason to apply it, in caso a married woman, upon valid consideration, should make a contract for the sale of her land, as to apply it to the case of a defectively-executed deed, or rather to an instrument which, under the statute, is no deed at all, not even a contract binding upon the wife—the husband receiving the whole consideration, and the wife no additional right beyond what she possessed before. If the court would emancipate the wife from all disability, there would bo less objection to this strange doctrine. But when it is proposed not to relieve her from her disabilities, but only to withdraw her from their protection—to let them remain against her, but not in her favor—it would not seem to commend itself very strongly to equity adoption. But it Í3 urged that to refuse to enforce a defectively-executed deed against a married woman would be a fraud, not so much so as to refuse to enforce a contract against her for the sale of land, where she had *533 received the consideration; yet it is admitted the latter could not be done. But where the law imposes a disability it would not presume fraud, because the person upon whom it rests takes shelter under such disability—much less will equity. It may bo morally wrong for an infant to borrow money and not repay it, but the law will not compel him, nor will equity. Where the law imposes a disability, equity will not presume fraud. Disabilities are imposed upon infants and married women as a shield, a protection, which the law furnishes to their weakness. The law confers this shield. Equity will not take it away. A married *woman may take shelter under this disability. Equity will not drag from her the protection of this shield. If the defective deed, by reason of her disability as a married woman, divests her of no right, equity can not enforce it against her. Her disability, as a-shield, protects her from every assault. - The constitutionality of the curative act can not then be supported upon the ground that any equity passed from the wife; if it deprive her of her rights, it must be in the naked deformity of its own force.
But it is said the curative act is valid because it merely supplies the omission of the officer. That the woman had done all in her power to get rid of her estate or right of dower, but that the officer had failed to perform his duty. Whether the woman had done so or not is a matter of mere assumption. It may have been, that for the sake of peace, she joined in the deed knowing that unless the contents wore made known to her, it divested her of no right. But all this is immaterial. It can not be said that the fact whether the woman knew the contents of the deed or not, is matter of mere clerical omission. That is matter of substance that pertains to the wTife, and the legislature did not intend to leave it in doubt; the statute directs that the officer shall read or otherwise make known to her the contents of the deed, and state that important fact in the certificate of acknowledgment. It can not be denied that the legislature had the right to make the certificate ; that the contents of the deed were made known to the wife—a part of its execution. The certificate of acknowledgment is a part of the execution of the deed; without it, it would be no deed. Yet, that is the act of the officer, but if he should fail to make any certificate of acknowledgment, it would be no deed that could be enforced against a married woman. If the officer fail to make out the certificate, which the statute requires, it is no cer *534 tificate at all, and there is no deed. If there be no certificate, as to tho married woman, such as the statute requires, that being a .part of tho execution, it is no deed as to her; it can not be enforced
against her as a contract; if it could, it *conld not be done under the curative act, because that in express terms only applies to deeds 11 heretofore executed pursuant to law." If the,act of the officer makes up part of tho execution of a deed, and such act bo not done, it is no deed, because, to be a deed, it mast be executed. The recording of a mortgage, the court has held under the statute, is part of its execution, and it has been repeatedly held that if it bo not recorded, it is no mortgage, and can not be enforced in any form, cither in law or equity. Hence, if the officer fail'to do that which the statute requires him to do, as part of tho execution of the deed, it is no deed, and if tho curative act supplies the lack of execution, it converts that into a deed, which before, at best, could only be regarded as a contract, and gives effect to such contract to deprive her of her rights. The constitutionality of this act, can derive no aid upon this ground.
Thus, wo perceive, it is utterly useless to attempt to disguise the matter. The constitutionality of the curative act of 1835 can not bo supported upon any of the assumed grounds. It can not be supported upon the assumed ground that tho court erred in the construction of the act of 1805 and 1818, in Connell v. Connell, because that would be a direct assumption of judicial power, and an attempt on the part of the legislature to construe its own acts. It can not be supported upon tho ground that it was enacted to relieve a doubt: none such existed; or that it barely changes a rule of evidence, because that is not its character; or that it changes an equitable into a legal right, for no equity existed; or that it merely supplied the omission of the officer, because on the last point it would be to supply the execution of a deed, which converts a contract of no validity into a binding deed. If it be supported at all, it must be upon the naked ground that the legislature has the power to transfer the property of one person to another, by its own will. If the woman, being under disability, had done no act which deprived her of any right, prior to the act of 1835, and that act deprives her of rights which she had in no sense parted *with, either in law or equity, it is a simple transfer of property by legislative will. It is admitted, conceded, and can not be denied with any truth, that this act was passed for *535 the direct purpose and for the sole reason that deeds of married women, which did not disclose that the officer had read or otherwise made known the contents to the woman exoeuting it, did not deprive her of any right to her estate, or to her dower. ¥e must lay out of view, in reasoning upon this point, the construction of the acts of 1805 and 1818, which the majority of the court have given ; that does not help the constitutionality of the curative act, although it supports the decision. Wo must look to the .simple nature, object, and intent of the act itself. There is no mode of argument which can support this act which is not in direct conflict with fundamental principles and the constitution. This act is the mere creature of interest, originated in the fear of loss of property, and was the result of pressure. It has been said by the enemies of our form of government, that our constitutions were mere paper, which would yield under the strong pressure of interest, or to great opposition, and would be easily molded to the convenience of the times. I had hoped that the principles of our constitution, like the calm influence of the spheres, would havo been capable of resisting every assault, and of holding the wildest elements under the control of order and law.
It should be borne in mind, that the principles of our goverment are new, and wo should be careful not to permit evil example to overshadow the groat truths which lie at the foundation of our rights; principle should never be sacrificed to obtain apparent temporary good. But precedents may work no general evil in quiet and peaceful times. - But like others, wo must undergo periods of excitement and trial. It is then, when prejudice has dethroned reason and passion seeks to trample down right, that bad precedents are seized upon to justify the worst of acts. If we permit the great safeguards of our rights, which have been constructed with wisdom and caution, to be weakened or invaded, when evil *times shall come, instead of finding safety under the broken fragments of a shattered constitution, we shall be made the victims of oppression under the forms of law. Unreasoned-violence creates too much opposition and alarm, to be a source of much danger, the first tread of despotism is over over violated principles. It is the oppression of law and not the hand of force which should cause real alarm. If we may legislate a woman out of her rights, because it was thought she should have relinquished them, and a man out of his land, which had been adjudged him by *536 the courts upon the ground of hardship, a broad door is open for the exertion of power under, some pretense or another, to the hazard of person and property.
I care not how honest the legislature may have been in passing a law, and I am as ready to admit that the members of the legislature wero as honest and anxious to do right as the members of the court, yet if such law invades private rights, and violates the constitution, I shall ever, as a judge, without hesitation declare it to be void. I hold the curative act of 1835, for the reasons I have assigned, and the reasons which have heretofore been assigned by this court, to be unconstitutional and void. And the cases of Good v. Zercher, and Cummins v. Silliman, are law. The reasoning of these cases has not been at all controverted or shaken, and I believe if but few persons had been affected by the principles thus announced, that their authority would not have been questioned. The only escape from their conclusion is to abandon the curative act, and resort to the construction of the acts of 1805 and 1818. The curative act is only defensible upon a few bald precedents, resulting from confused notions and the perversion of principle, and stands opposed to all enlightened jurisprudence and correct notions of legislative power, and to the fundamental principles of our constitution and system of government.